UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

AHMADOU SANKARA,

        Petitioner,

    v.                                                             19-CV-174
                                                                  DECISION AND ORDER

WILLIAM BARR,
Attorney General;

THOMAS FEELEY,
Field Office Director for Detention and
Removal, Buffalo Field Office, Bureau of
Immigration and Customs Enforcement;
and

JEFFREY SEARLS,
Facility Director, Buffalo Federal
Detention Facility,

        Respondents.

---

Ahmadou Sankara is a native of Cote d'Ivoire ("Ivory Coast") and a citizen of Burkina Faso. Docket Item 14-2 at 15. His most recent detention by the United States Department of Homeland Security, Immigration and Customs Enforcement ("DHS") at the Buffalo Federal Detention Facility ("BFDF") in Batavia, New York, began on September 7, 2018. *Id.* at 22. He continues to be detained while he waits for the Second Circuit to address the motion to stay his removal and the merits of his challenge to the decision of the Board of Immigration Appeals related to his final order of removal. *See Sankara v. Barr*, No. 17-2257 (2d Cir.).

On January 18, 2019, this Court issued a decision and order dismissing Sankara's previous petition for a writ of habeas corpus "without prejudice to filing

another petition if his § 1226(c) detention becomes unreasonably prolonged . . . or if," after his removal proceedings, conclude, "his actual removal is no longer reasonably foreseeable." *Sankara v. Whitaker*, 2019 WL 266462, at *5 (W.D.N.Y. Jan. 18, 2019). A complete summary of Sankara's immigration proceedings and detention is set forth in this Court's decision and order of January 18, 2019. *Id.* at *1-*3.

Sankara did not wait long: on February 7, 2019, he filed another petition for a writ of habeas corpus under 28 U.S.C. § 2241, the petition now before this Court. Docket Item 1. On April 1, 2019, the respondents moved to dismiss Sankara's petition, Docket Item 12, and on April 10, 2019, Sankara replied and cross-moved for an order granting the petition, Docket Item 20.[1]

## DISCUSSION

28 U.S.C. § 2241 "authorizes a district court to grant a writ of habeas corpus whenever a petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States.'" *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003) (quoting 28 U.S.C. § 2241(c)(3)). Sankara raises several constitutional challenges to his immigration detention. *See* Docket Item 1. Before addressing those questions,

---

[1] On April 29, 2019, Sankara opposed the respondents' motion to dismiss. Docket Item 23. He contends that the response was untimely, arguing that the respondents' deadline to respond to his petition was March 30, 2019, *see* Docket Item 4, but that they did not file their response until April 1, 2019. March 30, 2019, was a Saturday, however. Under Rule 6(a)(1)(C) of the Federal Rules of Civil Procedure, if the last day of a deadline "is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday." Here, that was Monday, April 1, 2019. Therefore, the respondents did not miss the deadline.

2

however, this Court must address the government's arguments against reaching them. *See* Docket Item 16 at 3-6.

I.    **PROCEDURAL GATEKEEPING BARRIERS**

    A.    **Applicability of the Gatekeeping Provisions of the Antiterrorism and Effective Death Penalty Act of 1996**

The government argues that Sankara's habeas petition should be dismissed under the gatekeeping provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2244. Docket Item 16 at 3-4. Specifically, the government argues that Sankara needs permission for this action because "[b]efore a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application." § 2244(b)(3)(A).

"[T]he gatekeeping provisions of AEDPA, as set forth in 28 U.S.C. § 2244, do not apply to all habeas petitions, nor are multiple collateral attacks 'second or successive.'" *Barapind v. Reno*, 225 F.3d 1100, 1111 (9th Cir. 2000). "[T]he prior-appellate-review mechanism set forth in § 2244(b) requires the permission of the court of appeals before 'a second or successive habeas corpus application under section 2254' may be commenced." *Id.* Section 2254 "confers jurisdiction on district courts to issue 'writs of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court . . . on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Coady v. Vaughn*, 251 F.3d 480, 484 (3rd Cir. 2001). Sankara completed his New York State sentence on September 7, 2018, Docket Item 13 at 9, and he no longer is "in custody pursuant to the judgment of a State court." § 2254(a).

"Section 2241 confers jurisdiction on district courts to issue writs of habeas corpus in response to a petition from a state or federal prisoner who 'is in custody in violation of the laws or treaties of the United States.'" *Coady*, 251 F.3d at 484 (quoting § 2241). Because Sankara validly brings his habeas petition under § 2241, not under § 2254, the gatekeeping provisions of § 2244(b) do not apply. *Cf. Chambers v. United States*, 106 F.3d 472, 474 (2d Cir. 1997) ("We hold that a petition asserting a claim to relief available under 28 U.S.C. § 2255 is not a 'second or successive' application where the prior petition(s) sought relief available only under 28 U.S.C. § 2241.").

The government argues that the restrictions on successive habeas petitions under § 2244(b) should nonetheless apply here. First, it argues that "'the nature of a [§] 2241 proceeding is the same as those under [§§] 2254 and 2255.'"[2] Docket Item 16 at 5 n.3 (quoting *Davis v. Fechtel*, 150 F.3d 486 (5th Cir. 1998)). This Court rejects this argument for applying § 2241's gatekeeping provisions to Sankara's petition for two reasons.

First, "[s]tatutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985). Thus, even if this Court agreed with the government that "the nature" of Sankara's proceeding is the same as "those under" § 2254 or § 2255 proceedings, that would not override the text that limits § 2244(b)'s application to proceedings that exclude Sankara's. "Of course, words are given meaning by their

---

[2] Although § 2244(b) governs only "second and successive habeas corpus applications under [§] 2254," § 2255(h) provides that "[a] second or successive [§ 2255] motion must be certified as provided in [§] 2244."

context, and context includes the purpose of the text." A. Scalia & B.A. Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012). But the purpose of the statute cannot change its unambiguous words.

There is a second reason to reject the government's argument: the government's underlying premise—that "the nature" of this proceeding is the same as "those under" § 2254 or § 2255 proceedings—is misguided. Section 2241 "offer[s] relief for different claims" than those covered by §§ 2254 and 2255. *Chambers*, 106 F.3d at 474. "Section 2255 provides for relief [for those convicted of federal crimes]: (i) where the sentence was imposed in violation of the Constitution or the laws of the United States, (ii) where the court was without jurisdiction to impose the petitioner's sentence; (iii) where the sentence was in excess of the maximum authorized by law; and (iv) where the sentence is otherwise subject to collateral attack." *Id*. Section 2254 provides similar relief for prisoners who are "in custody pursuant to the judgment of a State court." 28 U.S.C. § 2254(a). So the gatekeeping provisions in § 2244 were designed "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 694 (2002). Stated another way, there are gatekeeping provisions for both §§ 2254 and 2255 to advance the public's interest in finality of criminal judgments.

Here, on the other hand, Sankara does not attack the validity of the state court judgment that resulted in his incarceration—he has already completed his state court sentence. Nor does he attack the validity of any federal criminal proceeding. Instead, he attacks the authority of the federal government to detain him for prolonged periods of time without any review of the basis for his detention. The public has no interest in the

5

finality of a judgment with respect to the categorial detention of a class of individuals under § 1226(c) without an individual adjudication of the reasons for their detention. So "the nature" of Sankara's § 2241 proceeding is actually quite different from "those under" §§ 2254 and 2255 proceedings.

The government argues that the gatekeeping provisions of § 2244 should apply here for a second reason: "Rule 1(b) of the Rules Governing Section 2254 Cases allows for the rules applicable to § 2254 habeas cases to be applied to other habeas cases, including those brought under § 2241." Docket Item 16 at 5 n.3. In fact, this Court and others regularly use the Rules Governing Section 2254 Cases for procedural guidance and to manage immigration detention habeas proceedings under § 2241. *See, e.g., Singh v. Whitaker*, 362 F. Supp. 3d 93, 99 n.4, 108 n.14 (W.D.N.Y. 2019); *Lorenzo v. Taylor*, 2018 WL 1092455, at *1 (D.N.J. Feb. 28, 2018); *Brito-Ramirez v. Kelly*, 2017 WL 1363904, at *1 n.2 (D.S.C. Mar. 17, 2017); *Mehighlovesky v. Holder*, 2012 WL 3000145, at *1 n.1 (D. Minn. July 9, 2012).

But Rule 1(b) does not say what the government says it says. Rule 1(b) provides that "[t]he district court may apply any or all of *these rules* to a habeas corpus petition not covered by Rule 1(a)." (emphasis added).[3] The gatekeeping provisions of 28 U.S.C. § 2244(b) are not part of "*those rules*." Rule 9 addresses second or successive petitions and provides that "[b]efore presenting a second or successive petition, the petitioner must obtain an order from the appropriate court of appeals authorizing the district court to consider the petition *as required by 28 U.S.C. § 2244(b)(3) and (4).*"

---

[3] Rule 1(a) provides that "[t]hese rules govern a petition for a writ of habeas corpus filed in a United States district court under 28 U.S.C. § 2254 by" certain persons.

(emphasis added).  But as discussed above, § 2244(b) does not apply to Sankara's petition.  Therefore, neither § 2244(b) nor Rule 9 "requires" permission of the court of appeals for Sankara's petition.  Rule 1(b) neither supersedes nor expands the scope of § 2244(b), nor does it foreclose Sankara's petition in any way.

B. **Abuse of the Writ Doctrine**

"The doctrine of abuse of the writ defines the circumstances in which federal courts decline to entertain a claim presented for the first time in a second or subsequent petition for a writ of habeas corpus."  *McCleskey v. Zant*, 499 U.S. 467, 470 (1991).  The government argues that this Court should decline to entertain Sankara's claims in light of this doctrine.  Docket Item 16 at 4-6.[4]

As an initial matter, it is unclear the extent to which the abuse of the writ doctrine applies to habeas challenges to the constitutional validity of § 1226(c) immigration detention—where the very basis of the claim involves the fact that the petitioner has not been given an individualized decision by a neutral decision maker justifying his detention.  As the Supreme Court explained in *McCleskey*, a primary concern underlying the abuse of the writ doctrine is the finality of judgments:

> The doctrines of procedural default and abuse of the writ implicate nearly identical concerns flowing from the significant costs of federal habeas corpus review.  To begin with, the writ strikes at finality.  One of the law's very objects is the finality of its judgments.  Neither innocence nor punishment can be vindicated until the final judgment is known.  "Without finality, the criminal law is deprived of much of its deterrent effect."  *Teague v. Lane*, 489 U.S. 288, 309 (1989).  And when a habeas petitioner succeeds in obtaining a new trial, the "'erosion of memory' and 'dispersion of witnesses' that occur with the passage of time," *Kuhlman v. Wilson*, 477

---

[4] The statutory gatekeeping provisions in 28 U.S.C. §§ 2244(b) and 2255(h) "for the most part, codified the longstanding abuse-of-the-writ doctrine."  *Boumediene v. Bush*, 553 U.S. 723, 774 (2008).

7

> U.S. [436,] 453 [1986], prejudice the government and diminish the changes of a reliable criminal adjudication.

499 U.S. at 490-91; *see also Camarano v. Irvin*, 98 F.3d 44, 46 (2d Cir. 1996) ("The abuse of the writ doctrine is rooted in the need for finality and concerns of comity[;] . . . however, neither concern is implicated when a petition is filed after a prior petition is dismissed without prejudice for failure to exhaust state remedies").

In contrast, when a petitioner challenges his ongoing immigration detention pending the resolution of his removal proceedings because he has not received any individualized hearing on whether his detention is justified, there has not been *any* "judgment" on that question at all, let alone questions about the finality of the judgment. So in such circumstances, the court is not reviewing some decision maker's reasoning; in fact, there has been no decision and no reasoning. Section 1226(c) simply mandates detention. Therefore, the finality interests that underlie the abuse of the writ doctrine are not present in cases like this one.

That being said, the abuse of the writ doctrine also is designed to minimize the "heavy burden on scarce federal judicial resources, and . . . the capacity of the system to resolve primary disputes." *McClesky*, 499 U.S. at 491. Furthermore, the doctrine minimizes "incentives to withhold claims for manipulative purposes and may establish disincentives to present claims when evidence is fresh." *Id.* at 492. These interests might support the applicability of the doctrine even when aliens subject to § 1226(c) detention bring habeas claims.

But there is a more fundamental reason why the abuse of the writ doctrine does not apply here. "The doctrine of abuse of the writ defines the circumstances in which federal courts decline to entertain a claim presented for the first time in a second or

8

subsequent petition for a writ of habeas corpus." *Id.* at 470. "Cases in which numerically second petitions have not been treated as 'second or successive' can be understood as describing factual scenarios in which the application of a modified res judicata rule would not make sense." *United States v. Barrett*, 178 F.3d 34, 44 (1st Cir. 1999). "Applying the no-second-bite rule makes no sense when a prior petition gave the prisoner what amounts to *no* bite at the apple—because the prior petition involved a different apple, because no bite was taken when the apple previously was before the court, or because no bite *could have been taken* at that time because the claim had not yet come into existence or would not have been cognizable at the time of the earlier petition." *Id.* (quoting 2 Liebman & Hertz, *Federal Habeas Corpus Practice and Procedure* § 28.3a, at 275 (2d ed. Supp. 1997)).

Here, Sankara's first petition functionally "involved a different apple." *Id.* And here, it also is unclear the extent to which—and whether—Sankara's apple is ripe. *See id.* When the Court ruled on his last habeas petition, it adjudicated the validity of Sankara's at-the-time four-month immigration detention. *See Sankara*, 2019 WL 266462, at *5. In so doing, the Court expressly permitted Sankara to file "another petition if his § 1226(c) detention becomes unreasonably prolonged." *Id.* And precisely when § 1226(c) detention becomes "unreasonably prolonged" is a question involving "substantial uncertainty." *Hechavarria v. Sessions*, 891 F.3d 49, 58 (2d Cir. 2018).

Thus, the question now presented is whether Sankara's current § 1226(c) detention—approaching eight months—without an individualized hearing violates the Constitution. That is a different question than the one presented in his first petition. *Cf Chambers*, 106 F.3d at 475 ("a petitioner who files a [§] 2255 motion may raise claims

that could not have been raised in a previous [§] 2241 petition, and we see no abuse of the writ in such a situation"). And this Court sees no reason why Sankara should not be permitted to raise a claim under the Eighth Amendment, *see infra* at 16-19, in this petition when his last petition's claim was raised only under the Due Process Clause. Therefore, the abuse of the writ doctrine does not foreclose Sankara's petition or any of its claims.

## II. DUE PROCESS CLAUSE

The Fifth Amendment's Due Process Clause forbids depriving any "person . . . of . . . liberty . . . without due process of law." "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). "Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments." *Plyer v. Doe*, 457 U.S. 202, 210 (1982). At the same time, however, Congress has "broad power over naturalization and immigration, [permitting it to] make[] rules that would be unacceptable if applied to citizens." *Demore v. Kim*, 538 U.S. 510, 521 (2003) (quoting *Mathews v. Diaz*, 426 U.S. 67, 79-80 (1976)).

Sankara argues that his "ongoing prolonged detention [without an] individualized hearing before a neutral decisionmaker" violates his procedural due process rights. Docket Item 1 at 40. The Due Process Clause is not offended by the mandatory detention of aliens without a hearing for the "*brief period necessary* for . . . removal proceedings." *Demore*, 538 U.S. at 513 (emphasis added). But an alien "could be entitled to an individualized determination as to his risk of flight and dangerousness if

the continued detention became unreasonable or unjustified." *Id.* at 532 (Kennedy, J., concurring).

In *Demore*, the Court explicitly noted that "in the majority of cases [§ 1226(c) detention] lasts less than the 90 days . . . considered presumptively valid in *Zadvydas*." *Id.* at 529. Diving even deeper, the Court noted that "in 85% of the cases in which aliens are detained pursuant to § 1226(c), removal proceedings are completed in an average time of 47 days and a median of 30 days." *Id.* And "[i]n the remaining 15% of cases, in which the alien appeals the decision of the Immigration Judge to the [BIA], appeal takes an average of four months, with a median time that is slightly shorter." *Id.* Even though the noncitizen in *Demore* "was detained for somewhat longer than the average—spending six months in INS custody prior to the District Court's granting habeas relief," his six-month detention was still reasonable in part because he "had requested a continuance of his removal hearing." *Id.* at 530-31.[5] But "[a]s detention continues past a year, courts become extremely wary of permitting continued custody

---

[5] The government argues that *Demore* should be read to mandate that "a minimum of 16-months' detention [pass] before a petitioner can assert a colorable habeas claim based on pre-removal order detention." Docket Item 16 at 8. The government bases its contention on the fact that "the noncitizen in *Demore* was actually detained for 16 months, and, thus, *Demore* implicitly forecloses any challenge before this time has passed." *Id.* But, in fact, the noncitizen in *Demore* was detained for only six months before the district judge ordered his release. *Demore v. Kim*, 538 U.S. 510, 530-31 (2003) ("Respondent was detained for somewhat longer than the average—spending six months in INS custody prior to the District Court's order granting habeas relief.").

The government's argument is based on the time the *Demore* noncitizen spent in detention *after* the Supreme Court issued its decision. But the Supreme Court did not consider the constitutionality of the noncitizen's prolonged detention *after* its decision, and this Court does not understand why that time period is relevant to the Supreme Court's decision regarding the six-month detention it analyzed.

11

absent a bond hearing." *Muse v. Sessions*, 2018 WL 4466052, at *4 (D. Minn. Sept. 18, 2018).

This Court "has evaluated procedural due process challenges to immigration detention with a two-step inquiry." *Hemans v. Searls*, 2019 WL 955353, at *5 (W.D.N.Y. Feb. 27, 2019). "As the first step, the Court considers whether the alien's detention has been unreasonably prolonged." *Id.* "If it has not, then there is no procedural due process violation." *Id.* "But if it has, the Court proceeds to step two and 'identifies the specific dictates of due process' by considering the *Mathews v. Eldridge* factors." *Id.* (quoting 424 U.S. 319, 335 (1976)). "If the government has not provided the procedural safeguards dictated by the *Mathews* factors to an alien subject to unreasonably prolonged detention, then his continued detention violates procedural due process." *Id.*

"The constitutional sufficiency of procedures provided in any situation, of course, varies with the circumstances." *Landon v. Plasencia*, 459 U.S. 21, 34 (1982) (cited in *Jennings v. Rodriguez,* 138 S. Ct. 830, 852 (2018)). "[W]hen weighing the lawfulness of the continued detention of an alien under the Due Process Clause" several factors determine whether detention is unreasonably prolonged. *Jamal A. v. Whitaker*, 358 F. Supp. 3d 853, 858 (D. Minn. 2019). For example, this Court has considered "(1) the total length of detention to date; (2) the conditions of detention; (3) delays in the removal proceedings caused by the parties; and (4) the likelihood that the removal proceedings will result in a final order of removal." *Hemans*, 2019 WL 955353, at *6; *see also*, *Jamal A.,* 358 F. Supp. 3d at 858-59; *Cabral v. Decker*, 331 F. Supp. 3d 255, 261 (S.D.N.Y. 2018); *Hernandez v. Decker*, 2018 WL 3579108, at *6-*7 (S.D.N.Y. July 25, 2018); *Sajous v. Decker*, 2018 WL 2357266, at *10-*11 (S.D.N.Y. May 23, 2018).

First, and most important, courts consider the length of detention. Sankara has been in DHS custody since September 7, 2018. That is not quite twice as long as the four-month average period contemplated in *Demore*, *see* 538 U.S. at 529, and about two months longer than the noncitizen's in *Demore*. *Id.* at 530-31. Some courts have found detention shorter than a year to be unreasonably prolonged. *See*, *e.g.*, *Vargas v. Beth*, 2019 WL 1320330, at *8 (E.D. Wis. Mar. 22, 2019) ("approximately nine and a half months"); *Cabral*, 331 F. Supp. 3d at 261 ("over seven months" and "over nine months" by the next removal-related hearing); *Hernandez*, 2018 WL 3579108, at *1, *12 (nine months); *Sajous*, 2018 WL 2357266, at *1 (over eight months); *Jarpa v. Mumford*, 211 F. Supp. 3d 706, 720 (D. Md. 2016) (exceeding ten months). But few cases involve detention quite as short as Sankara's to date. So the length of Sankara's detention alone does not make his detention unreasonably prolonged.[6]

---

[6] Sankara contends that "[t]he recognition that six months is a substantial period of confinement—and is the time after which additional process is required to support continued incarceration—is deeply rooted in our legal tradition." Docket Item 1 at 36. He points to *Duncan v. Louisiana*, 391 U.S. 145, 146 (1968) to support his claim. *Id.* In *Duncan*, the Supreme Court concluded that the Sixth and Fourteenth Amendments require a state to provide a jury trial to a defendant accused of a misdemeanor punishable by a maximum of two years' imprisonment, even though that defendant was sentenced to serve only sixty days' incarceration. *Id.* at 162. In discussing the period of incarceration a state could constitutionally impose as punishment without a jury trial, the Court opined that "in the late 18th century in America crimes triable without a jury were for the most part punishable by no more than a six-month prison term, although there appear to have been exceptions to this rule." *Id.* at 161. But the Court also noted that "[i]n 49 of the 50 States crimes subject to trial without a jury . . . are punishable by no more than one year in jail." *Id.* In any event, the Court determined that it "need not . . . settle in [that] case the exact location of the line." *Id.* And even though this Court agrees with Sanakra's argument that each time the government forces an individual to sustain any period of unjustified physical confinement the government imposes a severe burden on that person's liberty, the Court's analysis in *Duncan* has little bearing on the legal questions presented in this case regarding the extent of permissible immigration detention without a hearing.

13

Second, courts consider the conditions of detention. But neither party has supplied the Court with any information about the conditions that Sankara faces at the Buffalo Federal Detention Facility. So this Court cannot address that factor.

Third, courts consider whether either side is responsible for the delay. The Second Circuit has found that this factor weighs against finding detention unreasonable when an alien "has 'substantially prolonged his stay by abusing the processes provided to him,'" but not when "an immigrant . . . simply made use of the statutorily permitted appeals process." *Hechavarria*, 891 F.3d at 56 n.6 (quoting *Nken v. Holder*, 556 U.S. 418, 436 (2009)).

Here, on July 20, 2012, an Immigration Judge ordered Sankara removed to Burkina Faso, or in the alternative, to the Ivory Coast. Docket Item 13 at 5.[7] Sankara appealed the Immigration Judge's decision to the BIA, which dismissed his appeal on July 15, 2013. *Id.* at 6. The record does not evidence any appeal of that decision to the Second Circuit. Instead, at some point "[w]ell over 3 years later," in late 2016 or early 2017, Sankara moved the BIA to reopen or a reconsider its decision. Docket Item 13-1 at 12. On June 2, 2017, the BIA denied his motion. *Id.* at 13. On July 21, 2017, Sankara filed an untimely petition for review of the BIA's decision with the Second Circuit. Docket Item 13 at 8. On July 24, 2017, Sankara filed an untimely motion to reconsider the BIA's decision with the BIA, which the BIA denied on August 28, 2017. *Id.* Sankara also sought judicial review of the BIA's decision to deny his motion to

---

[7] At the time the Immigration Judge issued his decision ordering Sankara removed, Sankara was not in DHS custody, but he was placed in DHS custody upon his release from the Nassau County Correctional Center on November 16, 2012. Docket Item 13 at 6.

14

reconsider his decision in the Second Circuit. *See* Order, *Sankara v. Barr*, No. 17-2257 (2d Cir. Jan 4, 2019).

The "statutorily permitted appeals process," *Hechavarria*, 891 F.3d at 56 n.6, provides aliens with the right to seek judicial review of BIA decisions in the court of appeals. 8 U.S.C. § 1252. The statute requires that a "petition for review must be filed not later than 30 days after the date of the final order or removal." *Id.* § 1252(b)(1). Sankara has not provided an explanation why, instead of timely asking the court of appeals to review the BIA's decision in 2013, he waited three years to seek reconsideration by the BIA. Had Sankara sought judicial review of the BIA's decision in 2013 in a timely manner—consistent with the statutory deadline—the Second Circuit in all likelihood would have decided by now whether the BIA's decision was valid. Stated another way, if he had acted without delay and as required by statutory deadlines, Sankara probably would not be subject to immigration detention now. At the same time, Sankara's petition for judicial review of the BIA's decisions has been pending in the Second Circuit since July 21, 2017—approaching two years.[8] *See Sankara v. Barr*, No. 17-2257 (2d Cir.). This Court cannot conclude that the delay since Sankara initiated the proceeding in the Second Circuit his attributable to him. Although Sankara bears some responsibility for delay, considering all the delays here this Court concludes that this

---

[8] On January 4, 2019, a Second Circuit panel granted in part and denied in part the government's motion to dismiss Sankara's petition. *See* Order, *Sankara v. Barr*, No. 17-2257 (2d Cir. Jan 4, 2019), at 1. The panel agreed with the government that it lacked jurisdiction to consider Sankara's challenge of the BIA's decision to deny reopening Sankara's case on June 2, 2017, because the appeal was filed more than thirty days after the ruling. *Id.* But the panel concluded that his petition "had ripened into a challenge to the BIA's August 2017 denial of [his] July 2017 motion to reconsider," which was timely and remains pending. *Id.* at 2. The panel deferred ruling on Sankara's remaining motions. *Id.*

15

factor does not weigh in favor of or against a determination that Sankara's detention has been unreasonably prolonged.

Finally, courts consider the likelihood that the removal proceedings will result in a final order of removal. In this case, as addressed above, Sankara did not appeal his final order of removal to the Second Circuit. The BIA also denied Sankara's motion to reopen his proceedings, and Sankara failed to seek judicial review of that determination in a timely manner. Therefore, the Second Circuit is without jurisdiction to consider whether the BIA erred in denying his motion to reopen. *See* Order, *Sankara v. Barr*, No. 17-2257 (2d Cir. Jan 4, 2019), at 1. The only question that remains pending before the Second Circuit is whether the BIA erred in denying Sankara's motion to reconsider its decision not to reopen Sankara's removal proceedings. *See id.* Given the limited scope of the question pending before the Second Circuit and the degree of deference typically afforded agencies on procedural questions such as whether to reopen—let alone to reconsider a decision to reopen—this Court concludes that this factor weighs against finding that Sankara's detention has been unreasonably prolonged.

After weighing these factors, this Court finds that Sankara's detention has not yet been unreasonably prolonged. Therefore, his detention without an individualized bond hearing does not violate the Due Process Clause. *See Demore*, 538 U.S. at 532 (Kennedy, J., concurring).

## III. EIGHTH AMENDMENT EXCESSIVE BAIL CLAUSE

"The opening clause of the Eighth Amendment, 'Excessive bail shall not be required,' is one of the least litigated provisions in the Bill of Rights." *Galen v. Cty. of Los Angeles*, 477 F.3d 652, 659 (9th Cir. 2007). Sankara seeks to buck that trend: He

16

argues that the "government's categorial denial of bail to certain noncitizens violates the right to bail encompassed by the Eighth Amendment" and that his "prolonged detention without a bond hearing violates the Eighth Amendment." Docket Item 1 at 41.

Decades ago, legal scholars began debating whether the Excessive Bail Clause implied substantive limitations on legislative authority to declare certain classes of crimes or criminals nonbailable. "Given the murkiness of the constitutional text and its origins, . . . several distinct interpretations of the provision . . . have evolved." Lawrence H. Tribe, *An Ounce of Detention: Preventative Justice in the World of John Mitchell*, 56 Va. L. Rev. 371, 399 (1970). "One view has been that the prohibition against excessive bail implies an underlying right to be admitted to bail in all cases, or at least in all non-capital cases." *Id.*; *see* Caleb Foote, *The Coming Constitutional Crisis in Bail: I*, 113 U. Pa. L. Rev. 959 (1965); *see also* Donald B. Verrilli, Jr., Note, *The Eighth Amendment and the Right to Bail: Historical Perspectives*, 82 Colum. L. Rev. 328, 362 (1982). "The principal competing view has been that the prohibition simply limits judicial abuse of the power to set bail in those cases where Congress has authorized that it be set." Tribe, *supra* at 399; *see* John N. Mitchell, *Bail Reform and the Constitutionality of Pretrial Detention*, 55 Va. L. Rev. 1223 (1969).

In *Carlson v. Landon*—an immigration detention case—the Supreme Court apparently took the latter view when it said, in dicta:

> The bail clause was lifted with slight changes from the English Bill of Rights Act. In England that clause has never been thought to accord a right to bail in all cases, but merely to provide that bail shall not be excessive in those cases where it is proper to grant bail. When this clause was carried over into our Bill of Rights, nothing was said that indicated any different concept. The Eighth Amendment has not prevented Congress from defining the classes of cases in which bail shall be allowed in this country. Thus in criminal cases bail is not compulsory where the punishment may be death.

17

> Indeed, the very language of the Amendment fails to say all arrests must be bailable. We think, clearly, here that the Eighth Amendment does not require that bail be allowed under the circumstances of these cases.

342 U.S. 524, 545-46 (1952) (internal citations omitted).

Thirty-five years later, the Court considered whether the Bail Reform Act of 1984—which "allows a federal court to detain an arrestee pending trial if the Government demonstrates by clear and convincing evidence after an adversary hearing that no release conditions 'will reasonably assure . . . the safety of any other person and the community'"—violates the Due Process Clause or the Excessive Bail Clause. *United States v. Salerno*, 481 U.S. 739, 741 (1987). In analyzing the Excessive Bail Clause claim, the Court assumed without deciding that the Excessive Bail Clause provides some substantive limit on Congress's power to "define the classes of criminal arrestees who shall be admitted to bail." *Id.* at 754. Assuming that the clause limits Congressional power, then

> [t]he only arguable substantive limitation of the Bail Clause is that the Government's proposed conditions of release or detention not be "excessive" in light of the perceived evil. Of course, to determine whether the Government's response is excessive, we must compare that response against the interest the Government seeks to protect by means of that response. Thus, when the Government has admitted that its only interest is in preventing flight, bail must be set by a court at a sum designed to ensure that goal, and no more. We believe that when Congress has mandated detention on the basis of a compelling interest other than prevention of flight, as it has here, the Eighth Amendment does not require release on bail.

*Id.* (internal citations omitted). So *Salerno* ruled out the possibility that the Excessive Bail Clause imposes a *right* to bail in every case, but it did not resolve the debate over whether that clause imposes any limit on legislative power to deny bail to classes of individuals. *See id.*

18

In *Demore*, the Supreme Court did not analyze immigration detention under the Excessive Bail Clause. But there is no reason why the Court's conclusion that the government's interests supporting immigration detention without an individualized hearing during removal proceedings for a brief period under the Due Process Clause would not also satisfy any requirements under the Excessive Bail Clause. *See Demore*, 538 U.S. at 518, 527-28 ("detention of deportable criminal aliens *pending their removal proceedings* . . . necessarily serves the purpose[s] of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed" and preventing crime by deportable criminal aliens.) (emphasis in original).

In any event, there is little reason to believe that the Excessive Bail Clause might provide relief for mandatory detention that has become "unreasonably prolonged" when the Due Process Clause does not. Therefore, for the same reasons that this Court determined that Sankara's detention is not unreasonably prolonged as a matter of due process, his detention without an individualized bail hearing is not "excessive in relation to the valid interests [the government] seeks to achieve." *Galen*, 477 F.3d at 660.[9]

---

[9] The government argues that the Eighth Amendment does not apply to civil confinement. Docket Item 16 at 10-11. Because Sankara's Excessive Bail Clause claim fails notwithstanding the resolution of that issue, the Court assumes without deciding that the Excessive Bail Clause does apply to immigration detention. But it is worth noting that the government's position is at odds with Justice Breyer's opinion in *Jennings*. *See* 138 S. Ct. at 862 (Breyer, J., dissenting). Moreover, if the Excessive Bail Clause did not apply to immigration detention proceedings, it would have been much simpler for the Court in *Carlson v. Landon* to have said so instead of asserting that the Clause "merely . . . provide[s] that bail shall not be excessive in those cases where it is proper to grant bail" and conversely implying that it may play some role "after unusual delay in deportation hearings." 342 U.S. 524, 545-46 (1952). Furthermore, the Excessive Bail Clause does not expressly restrict its application to "criminal" proceedings—and this Court finds it unlikely that its application may "be avoided by the

## **CONCLUSION**

For the foregoing reasons, the respondents' motion to dismiss is GRANTED. Sankara's motion to request an order granting his habeas petition, Docket Item 20, and his petition for writ of habeas corpus, Docket Item 1, are DENIED without prejudice. *See Hechavararia v. Sessions*, 2018 WL 5776421, at *6 (W.D.N.Y. Nov. 2, 2018) (quoting *Muse*, 2018 WL 4466052, at *4) ("As detention continues past a year, courts become extremely wary of permitting continued custody absent a bond hearing."). Sankara's motion, Docket Item 23, is DENIED.

SO ORDERED.

Dated: April 30, 2019
Buffalo, New York


   *s/ Lawrence J. Vilardo*
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE

---

simple label [the government] chooses to fasten upon its conduct or its statute." *Cf. Sessions v. Dimaya*, 138 S. Ct. 1204, 1229 (2018) (Gorsuch, J., concurring) (quoting *Giaccio v. Pennsylvania*, 382 U.S. 399, 402 (1966)); *see also Austin v. United States*, 509 U.S. 602, 608-09 (1993) (determining that the Eighth Amendment's Excessive Fines Clause applies to both civil and criminal proceedings and emphasizing that the "text of the Eighth Amendment includes no similar limitation" to "provisions of the Bill of Rights [that] are expressly limited to criminal cases.").